UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

MARY PARKER,                          )
                                      )
            Claimant,                 )
                                      )
      v.                              )          No. 4:13CV1926 TIA
                                      )
CAROLYN W. COLVIN,                    )
Acting Commissioner of Social Security, )
                                      )
            Defendant.                )

## MEMORANDUM AND ORDER

This action is before the Court for judicial review pursuant to 42 U.S.C. §§ 405(g) and 1631 (3) of the Social Security Act ("the Act"), of the final decision of the Commissioner of Social Security ("Commissioner") concluding that Claimant Mary Parker was not entitled to Supplemental Security Income ("SSI") benefits under Title XVI of the Act, 42 U.S.C. §§ 1381, *et seq*. Claimant has filed a Brief in Support of her Complaint and the Commissioner has filed a Brief in Support of the Answer. For the reasons set forth below, the decision of the Commissioner shall be affirmed.

## I.      Procedural History

Claimant, who was born on November 2, 1963, filed her application for a SSI benefits under Title XVI of the Act on November 23, 2010, alleging an onset date of December 6, 2010,[1] with disability due to chronic back and neck pain resulting from multiple auto accidents, recurrent headaches, hypertension, and depression. (Tr. 12, 142-47, 158, 180.) On March 3, 2011, the

---

1      Claimant originally alleged a disability onset date of January 15, 2004, but subsequently amended the onset date to December 6, 2010. (Tr. 12, 46, 142, 158).

Commissioner denied Claimant's application at the administrative level.[2]   Claimant then timely

filed a written request for a hearing before an Administrative Law Judge ("ALJ").   At a June 5,

2012 hearing Claimant and a vocational expert (VE) gave testimony.

On September 6, 2012, the ALJ issued her decision finding that Claimant was not disabled

within the meaning of the Act.   (Tr. 12-23.)   The ALJ found that Claimant suffered from the

severe impairments of migraine and depression but concluded that she did not have an impairment

or combination of impairments listed in or medically equal to one contained in 20 C.F.R. part 404,

subpart P, appendix 1.   (Tr. 14, 16-17.)   The ALJ also determined that Claimant retained the

Residual Functional Capacity (RFC) to perform a range of unskilled, light work.   The ALJ further

concluded that Claimant had no past relevant work, but concluded on the basis of VE testimony

that her impairments would not preclude her from performing her past relevant work as a cashier

and that such positions exist in significant numbers in the national economy.   (Tr. 18, 22-23.)   On

August 29, 2013, the Appeals Council denied Claimant's request for review (Tr. 1-4).   Thus, the

ALJ's decision stands as the "final decision" of the Commissioner subject to review by this Court

pursuant to 42 U.S.C. § 1383(c)(3).

On appeal Claimant argues that the ALJ improperly discounted Claimant's testimony

concerning her subjective complaints, failed to cite to "some" medical evidence to support the

RFC determination and to give substantial weight to the opinions of an examining physician and a

treating physician.   In addition, Claimant contends that the hypothetical question posed to the VE

failed accurately to capture the consequences of Claimant's impairments.

---

2      Claimant's appeal in this case proceeded directly from the initial denial to the ALJ level
because Missouri is one of several test states participating in modifications to the disability
determination procedures that eliminate the reconsideration step in the administrative appeals
process. *See* 20 C.F.R. § 416.1406 (2013).

In response, the Commissioner asserts that the ALJ properly evaluated Claimant's credibility and included all credible limitations in her RFC determination, that the ALJ did not err in failing to give significant weight to the opinions of an examining physician and a treating physician, and that the hypothetical question posed accurately reflected Claimant's RFC as determined by the ALJ.

## II.    Work History, Function and Disability Reports and Application Forms

In the Work History Report she completed on May 10, 2010, Claimant indicated that she had gone to school in 2003 to become a nail technician but dropped out due to her "condition." Thereafter, she had worked for brief stints bussing tables and as a cashier.   No work history was reported for the period after June, 2008.   (Tr. 220)

Claimant's Function and Disability reports reflected that she could not stay on her feet for more than 30 minutes, could not get in and out of a bath tub or go up and down stairs.   Claimant reported that she prepared a sandwich or frozen meal twice a day but was unable to stand long enough to do any other cooking.   Claimant also stated that she did some house work and laundry once a week but had to sit to rest frequently, left her home very little, did not drive, and shopped for groceries twice a month.   Claimant further indicated that did not have a savings or checking account but paid her bills and could make change.   She stated that she could walk about ten minutes without a rest, and lift ten pounds, but that squatting, bending, standing, reaching and walking were all difficult for her due to her back and neck pain.   (Tr. 159-167, 177-213.)   The Report included Claimant's medication record, dated March 13, 2012, lists the following medications: Cyclobenzaprine, Famotidine (Pepcid), "But/APAP," Buspirone, Pravastatin, Tramadol, Metoprolol, and extra strength acetaminophen.   (Tr. 219.)

**III**.    **Medical Records**

On April 28, 2004, Claimant was seen by Dr. Julio Iglesias, M.D. who noted that Claimant had been trying to get appointments at the neurology and pain management clinics but was having difficulty affording her care and medicine.   (Tr. 241.)   On September 9, 2004, Claimant saw Dr. Iglesias for complaints of lower back pain.   Dr. Iglesias prescribed Soma, Xanax, and Lortab. (Tr. 238.)   At a November 8, 2004 visit with Dr. Iglesias, Claimant complained of headache and back pain.   (Tr. 236.)   Physical examination revealed spasms in the cervical spine and in the paraspinal muscles.   (*Id*.)   Magnetic resonance images (MRIs) taken December 7, 2004, showed that for T11 through the 3rd sacral segment "vertebral body height and alignment" were "well-maintained without significant spondylolisthesis or compression deformity."   (Tr. 249.) The radiologist noted that the visualized posterior fossa and cranio-cervical junction were unremarkable.   (Tr. 248.)   The T12-L1 level of the spinal chord showed mild degenerative disease without stenosis.   At L1-L3-4 levels no stenosis was found.   (*Id.*)   At the L4-5 level there was minimal degenerative disease and minimal flattening of the dural sac but no significant spinal stenosis.   (*Id.*)   At L5-S1 the radiologist's impression was of cervical spondylosis, minimal degenerative changes without spinal canal or foraminal stenosis and no exiting nerve root impingement.   (*Id.*)   An MRI of the brain taken on the same date corroborated the findings of cervical spondylosis most notably at the C 6-7 level, minimal degenerative changes without spinal canal or foraminal stenosis and no exiting nerve root impingement.   In addition, little or no cervical spondylosis was evident at C2 through C6 and spinal and foraminal stenosis were absent. (Tr. 250-252.)   Despite the minimal degenerative/osteophyte disease noted, the radiologist found no convincing evidence for spinal cord impingement.   (Tr. 250.)

At a December 22, 2004 appointment with Dr. Iglesias, Claimant complained of "the shakes" and migraine headaches. At that time Claimant was taking Soma, Zantac and Maxalt. (Tr. 234.) At her February 3, 2005 visit with Dr. Iglesias, Claimant again complained of migraine headache. She was prescribed Maxalt, Xanax and Trazodone. (Tr. 231.)

The materials before the Court do not include any medical records for the period from February 4, 2005 through April, 18, 2010.

On April 19, 2010, Claimant was seen in the emergency room at St. Mary's Health Center. She complained of seven hours of severe epigastric pain radiating to her back. The medical history set forth in these notes mentions back injuries from previous motor vehicle accidents and provides that Claimant was "to start on pain management this week." (Tr. 280.) There is no reference to chronic back pain in these notes. Claimant's medications were reported as Lisinopril, Famotidine and Darvocet. (Tr. 273-306.)

On April 27, 2010, Claimant was seen by Jonathan Hayes, M.D. at St. Mary's Health Center Emergency Room. Her chief complaint was that she had slipped and fallen on the steps in her home. She reported that she suffered chronic back pain and had an appointment "to see pain management soon." (Tr. 263.) Dr. Hayes noted pain originating from the soft tissues around the spine and advised Claimant that the x ray of her coccyx did not definitively show a fracture, although fracture was possible. (Tr. 262-66.) At the April 27, 2010 visit Claimant's medications were recorded as Percocet, Lisinopril, Darvocet and Vicodin. (Tr. 268)

On May 4, 2010, Claimant was seen by Dr. Bryan Steele, M.D. at Southern Illinois Health Center. (Tr. 310.) The notes describe Claimant as "status post fall" with reported coccygeal fracture, chronic lower back pain for which she took Darvocet and Celebrex, and well-controlled

5

hypertension.   The notes again reflect that Claimant was to see "chronic pain management tomorrow."   (*Id*.)

On May 5, 2010, Claimant presented for pain management assistance at St. Anthony's Medical Center in Alton, Illinois complaining of chronic bilateral lower back, extremity, and posterior cervical pain with a rating of 10/10.   (Tr. 329.)   Claimant also complained of headache and neck pain resulting from multiple motor vehicle accidents dating from 2003.   (*Id*.)

Physical examination showed that straight leg raising was absent; Revel's signs were questionable (positive on the left, absent on the right); muscle strength of 5/5 throughout the upper and lower extremities and point tenderness over the posterior cervical soft tissues.   In addition Claimant described excruciating pain due to a recently diagnosed sacral fracture.   (Tr. 331.)   The physician, Dr. John Zabrowski, M.D., assessed nonspecific lower back and extremity pain and noted that due to absence of straight leg raise, the pain was not clearly linked to spinal stenotic or disc protrusion.   He posited possible sacroiliitis and pain related to recently diagnosed sacral injury.   (*Id*.)   A five view x-ray of the cervical spine and a MRI of the lumbar spine were ordered. In addition, Claimant was given a prescription for Tramadol and directed to take Tylenol.   (*Id*.).

A May 18, 2010 x-ray of the cervical spine revealed no evidence of cervical spine disease. (Tr. 327.)   An MRI of the lumbar spine taken on the same date also revealed no evidence of disease of the lumbar spine.   (Tr. 328.)

Dr. Steele, Claimant's primary care physician, completed a physical RFC questionnaire on or about December 8, 2010.[3]   (Tr. 428-432.)   At that time Dr. Steele, who had not seen Claimant

---

3     The record indicates that Dr. Steele signed the RFC form on December 8, 2010, but the form also bears an earlier receipt stamp of November 23, 2010. At any rate, the record supports a conclusion that the RFC was completed in late November or early December of 2010. (Tr.

for almost six months, indicated that he was unsure whether Claimant was a malingerer and noted that emotional factors such as anxiety affected the perceived severity of Claimant's symptoms and functional limitations.   (Tr. 428.)   Dr. Steele also questioned whether Claimant's physical and emotional impairments were consistent with her reported symptoms and functional limitations. (Tr. 429.)   Finally, Dr. Steele opined that although Claimant's back pain occasionally interfered with her attention and concentration, Claimant was capable of performing low stress jobs.   (*Id*.)

With respect to Claimant's limitations, Dr. Steele stated that Claimant could walk less than one block, could sit no more than 20 minutes without getting up to walk around and stand no more than 30 minutes at a time.   (*Id*.)   He also stated that Claimant's ability to stand and walk was limited to less than a total of two hours in an eight hour workday, and that she could sit for no more than two hours in an eight workday.   (*Id*.)   Dr. Steele asserted that Claimant would need a job that permitted her periods to walk around during the work day and allowed her four unscheduled breaks of less than five to ten minutes in an eight hour day.   He also stated that Claimant needed to be able to shift from sitting, standing, or walking at will, could only lift less than ten pounds. if required to lift frequently, occasionally lift ten pounds, rarely lift 20 pounds and never lift 50 pounds.   (*Id*.)   Dr. Steele found that Claimant had no significant limitations with respect to reaching, handling or fingering.   (*Id*.)   Dr. Steele also advised that Claimant should never climb ladders, rarely crouch or squat, and only occasionally twist, stoop, or bend and climb stairs.   (*Id*.) Finally, Dr. Steele opined that if Claimant were employed she would miss about 3 days of work per month due to her impairments.   (Tr. 431)

On January 29, 2011, a licensed psychologist, Nancy Higgins, PhD., examined Claimant and performed a consultative evaluation. (Tr. 337-343.) Dr. Higgins concluded that that Claimant suffered from recurrent major depressive disorder, severe but without psychotic features; an anxiety disorder not otherwise specified; a specific phobia, situational type, of bridges and a learning disorder, not otherwise specified. Dr. Higgins also found that Claimant complained of chronic neck and back pain, chronic fatigue, and exhibited hypertension, migraine headaches, obesity, gastroesophageal reflux disease (GERD), and an overactive bladder.

Dr. Higgins assigned Claimant an axis V GAF score of 54,[4] indicating moderate limitations and opined that she had an adequate ability to understand and remember the instructions necessary to participate in the interview, but that at times she also had cognitive difficulties in understanding those instructions and that it had been necessary to repeat the instructions for one of tasks. (Tr. 342-343.) Dr. Higgins also noted that as a result of her complaints of pain, Claimant had difficulty with concentration, and that Claimant would likely not have the ability to persist at a task for any significant length of time. (*Id.*) Dr. Higgins concluded that Claimant's ability to sustain concentration and persistence in tasks was variable, as was her ability to understand and remember instructions. Finally, she opined that Claimant's ability to interact socially and adapt to her environment was intact. (*Id.*)

During a February 23, 2011 routine visit Dr. Steele diagnosed Claimant with chronic back pain and anxiety. (Tr. 360.)

---

4    A GAF score represents a clinician's judgment of an individual's overall ability to function in social, school, or occupational settings, not including impairments due to physical or environmental limitations. Diagnostic & Statistical Manual of Mental Disorders (4th ed.) (DSM-IV) at 32. GAF scores of 31-40 indicate "[s]ome impairment" in reality testing or communication or "major" impairment in social, occupational, or school functioning; scores of 41-50 reflect "serious" impairment in these functional areas; scores of 51-60 indicate "moderate" impairment; scores of 61-70 indicate "mild" impairment.

Following Dr. Higgins' consultative evaluation, a state agency medical consultant reviewed the medical records. (Tr. 21, 344-54, 367-69.) Marsha Toll, PsyD. a licensed psychologist and a non-examining State Disability Determination Service Psychologist, completed a mental RFC questionnaire for Claimant on March 1, 2011. (Tr. 367-69.) Dr. Toll found Claimant moderately limited in her ability to: understand or remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, sustain an ordinary routine without special supervision, and travel to unfamiliar places or use public transportation. (Tr. 367-368.) Dr. Toll concluded that Claimant had the ability to understand simple one or two-step instructions and to persist at simple tasks. (Tr. 369.)

On the same date, Dr. Toll also completed a psychiatric review technique form stating that Claimant had affective and anxiety related disorders. (Tr. 344-355.) Specifically, Dr. Toll found that Claimant's activities of daily living and social functioning were mildly restricted and that she had a moderate degree of difficulty with concentration, persistence, and pace and no repeated episodes of decompensation of extended duration. (Tr. 352.) Dr. Toll also found Claimant's allegations of pain only partially credible. (Tr. 354.)

On March 9, 2011, Claimant received pain management services at St. Anthony's Health Center in Alton, Illinois.[5] (Tr. 423.) The Pain Clinic physician noted that Claimant suffered from migraine headaches and sleep difficulties and was anxious and depressed, with "good reason" to be so. (Id.) Claimant was referred to a neurologist for evaluation of migraine headaches, anxiety, and depression. (Tr. 423-424.)

---

5    The medical record for the for the March 9, 2011 pain management visit states that Claimant had been seen for the first time in the Pain Clinic on May 5, 2010, but no documentation of a May 5, 2010 visit appears in the record.

Dr. Steele saw Claimant at a follow-up visit on March 23, 2011, and listed her diagnoses as hypertension, anxiety, hot flashes, and back pain. (Tr. 358.) At an April 25, 2011 visit with Dr. Steele, Claimant reported chronic back pain and Dr. Steele identified the following conditions: chronic pain, hypertension, anxiety and headache. (*Id.*) Claimant visited Dr. Steele again on September 12, 2011, and reported fatigue. (Tr. 357.) At that time Dr. Steele identified her ailments as: left lower quadrant pain, fatigue, hypertension, and eye problems. (*Id*.).

Claimant was seen at the Barnes Jewish Hospital Emergency Department on October 7, 2011, for complaints of chest pain. (Tr. 373.) On November 15, 2011, when Claimant next saw Dr. Steele, she reported shortness of breath and was diagnosed with acute bronchitis. (Tr. 371.) On January 26, 2012, Claimant again reported to the Barnes Jewish Hospital Emergency Department complaining of shortness of breath. The examining physician noted a productive cough, a clearly enlarged spleen, headache, body aches, and fever. (Tr. 387, 392.)

Dr. Steele again saw Claimant on March 13, 2012, at which time she complained of diffuse pain. (Tr. 370.)

Claimant was seen by Dr. Miranda Coole, M.D. at Grace Hill Health Care Center on May 17, 2012, and complained of pain underneath her arm. (Tr. 433.) Dr. Coole noted the following conditions and symptoms: hypertension, hyperlipidemia, carbuncle and furuncle of other specified sites, myalgia and myositis with fibromyalgia and chronic headaches. (Tr. 435.) In a letter dated June 5, 2012, Dr. Coole wrote a letter stating without further explanation that Claimant's medical conditions made it inadvisable for her to serve jury duty. (Tr. 441.)

## IV.    Evidentiary Hearing (Tr. 41-71)

### A. *Claimant's Testimony*

At the evidentiary hearing Claimant testified that she was 48 years old and 5'6" tall.

Claimant stated that she had learning difficulties that lead to her placement in special education classes beginning in the sixth grade. She explained that she dropped out of high school in ninth grade because she "didn't like it," but eventually obtained her GED. Claimant testified that she could add and subtract but not multiply and divide and had difficulty making change, although she could do so in a situation where the cash register indicated the amount of change to give.

Claimant testified that her last job bussing tables had been approximately three years ago, and that she had quit because she couldn't "carry the buckets with the dishes." (Tr. 49.) She further testified that over the last ten to fifteen years her only other work had been brief stints as a cashier, and that as a cashier she had stocked shelves and lifted cases of soda. She stated that her back and her headaches currently kept her from working. She explained that the headaches were intermittent but lasted two to three days, were accompanied by nausea and affected her eyes. Claimant also testified that she had daily back pain, was restricted to walking about in her home and did no other walking. Claimant also stated that that she could sit for no more than ten to fifteen minutes before she experienced pain.

With respect to medication, Claimant testified that she took Tramadol for pain, Flerxiril for muscle spasm, Buspirone for anxiety and to help her sleep, and Advair for chronic obstructive pulmonary disease. Claimant reported difficulty remembering things, a dislike of crowds and highly changeable moods due to anxiety. She further stated that two to three times a month she experienced anxiety attacks, averaging about 45 minutes in length.

Claimant also testified that she lived with her daughter, washed dishes, but did no other housework, cooked very little and had no hobbies. She indicated that she has a pet dog that she feeds and waters but that she was not able to take the animal outside.

B. *Vocational Expert Testimony*

At the hearing, the vocational expert (VE) testified that a person of Claimant's age, education and past work experience, capable of performing at the light exertional level; who can occasionally climb ramps and stairs and never climb ladders or scaffolds, frequently balance and occasionally stoop, kneel, crouch and crawl; and limited to performance of unskilled work could perform the work of a cashier. The VE further testified that there were 1,685,000 cashier jobs in the national economy and 37,600 such jobs in Missouri. When asked to posit the above conditions and also to assume that, due to headaches, the person in question would be "off task" for a much as 45 minutes per day, in addition to scheduled breaks, the VE opined that such a person could not obtain a job as a cashier and would be unable to perform any other work available in the regional or national economies.

## V. **The ALJ's Decision**

The ALJ first determined that Claimant had not engaged in substantial gainful activity since November 23, 2010, the date of her SSI application. (Tr. 14.) The ALJ then found that Claimant had the severe impairments of migraine headache and depression in accordance with the requirements found at 20 CFR 416.920 (c), but that her allegations of impairment due to back and neck pain should be rejected for lack of sufficient evidence that those impairments had lasted more than the required 12 months. (*Id*.) In addition, the ALJ was not convinced that Claimant's back pain was a chronic condition dating from 2003 because she had not sought ongoing treatment from February 4, 2005 through April, 18, 2010. Similarly, because Claimant had not sought ongoing treatment, the ALJ questioned the credibility of her complaint that the pain she experienced rated a "10" on a scale of 10. The ALJ also noted that the 2010 x-rays of Claimant's cervical and lumbar

spine were normal and that the radiologist's subjective impression was of no more than limited, minimal degeneration.

Citing the medical evidence, Claimant's limited efforts to obtain medical treatment, the inconsistencies in the record and Claimant's poor work history, the ALJ concluded that her allegations of disabling symptoms were not credible. The ALJ did not entirely reject but gave little weight to the opinion of Dr. Steele, finding it "unpersuasive." (Tr. 15.) The ALJ discounted Dr. Steele's opinion to the extent that he opined on matters reserved to the ALJ. In addition, the ALJ noted that in completing the 2010 RFC questionnaire Dr. Steele referred only to Claimant's subjective complaints as evidence of her back pain and raised the possibility of malingering because there were no objective medical findings to support Claimant's allegations. Relying in part on Social Security Ruling 96-4p,[6] the ALJ found there was no medically determinable impairment associated with Claimant's complaints of pain. He noted that the record contained no diagnosis of and only "sporadic and conservative treatment" for her claims of pain. (Tr. 16.)

The ALJ next determined that Claimant did not have an impairment or combination of impairments meeting the severity of one of the listed impairments in 20 CFR part 404 Subpart P, Appendix 1, 20 C.F.R. 416.920(d), 416.925 and 416.926. The ALJ found that the severity of Claimant's mental impairment did not meet or equal the criteria of listing 12.04. With respect to "paragraph B" elements applicable to the mental impairment assessment the ALJ determined that

---

6       Social Security Ruling 96-4p states that :
        [n]o symptoms or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment.
SSR 96-4p.

Claimant had mild difficulty in the activities of daily living, mild difficulty in social functioning, moderate difficulties with respect to concentration, persistence and pace but had not experienced any extended episodes of decompensation.   The ALJ concluded, however, that this combination of "paragraph B" limitations did not satisfy the criteria of listing 12.04.   The ALJ also determined that the evidence failed to establish the "paragraph C" criteria.[7]   The ALJ then noted that the mild restrictions in Claimant's activities of daily living reflected in her consultative exam and functional report stemmed from her subjective complaints of pain which the ALJ did not find credible.

The ALJ attributed significant weight to the examining consultative opinion of Dr. Higgins and the opinion of Dr. Toll based on her review of the records, but gave no weight to the opinion of Dr. Coole, an examining physician.   (Tr. 20-21.)

The ALJ next determined that Claimant retained the residual functional capacity ("RFC") to perform a range of unskilled,[8] light work.[9]   In reaching that conclusion, the ALJ took into

---

7     Generally, Paragraph C criteria relate to signs of a chronic affective disorder of at least 2 years' duration including repeated episodes of decompensation of extended duration requiring medication and psychosocial support.

8     "Unskilled" work as defined for purposes of SSI determinations "is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time."   20 C.F.R. pt. 416.968 (a).   A person can usually learn to do an unskilled job in 30 days and such jobs require "little specific vocational preparation and judgment."   *Id*.   Finally, "[a] person does not gain work skills by doing unskilled jobs."   Id.

9     "Light work" as defined for purposes of SSI determinations "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds" and might require a good deal of walking or standing, sitting most of the time, and some pushing and pulling of arm or leg controls.   20 C.F.R. pt. 416.967 (b). In addition, the full range of light work requires standing or walking, off and on, for a total of approximately six hours of an eight hour work day, that sitting may occur intermittently during the remaining time; that the lifting requirement for the majority of light jobs can be accomplished with occasional, rather than frequent, stooping; and that many unskilled light jobs are performed primarily in one location, with the ability to stand being more critical than the ability to walk.   *See* SSR 83-10.

account, with respect to mental impairment, the function categories found in "paragraph B "of the adult mental disorders listings. *See* Listing of Impairments, SSR 96-8p, listing 12.00 The ALJ also considered Claimant's ability to perform light work, as defined in 20 CFR 416.967 (b). Specifically, the ALJ determined that Claimant could lift 20 pounds occasionally and ten pounds frequently, could push and/or pull the aforementioned weights, could stand and/or walk about six hours out of an eight hour workday with normal breaks, could sit for about six hours out of an eight hour workday with normal breaks and was restricted to unskilled work. (Tr. 18.)

The ALJ concluded that Claimant had no past relevant work, but that she would be able to make an adjustment to other jobs. Relying upon VE testimony, the ALJ concluded that Claimant would be able to perform a representative occupation such as cashier, which existed in significant numbers in the national economy. Consequently, the ALJ concluded that Claimant was not disabled within the meaning of the Act. (Tr. 22-23.)

## VI.    Applicable Law

In a disability insurance benefits case, the burden is on the claimant to prove that he or she has a disability. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001.) Under the Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). A claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§

423(d)(2)(A) and 1382c(a)(3)(B); *see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

The Commissioner has promulgated regulations outlining a five-step process to guide an ALJ in determining whether an individual is disabled. Under these regulations, the ALJ first determines whether the individual is engaged in "substantial gainful activity." If she is, then she is not eligible for disability benefits. 20 C.F.R. § 404.1520(b). If she is not, the ALJ must consider at Step Two whether the individual has a "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant is not found to have a severe impairment, she is not eligible for disability benefits. If, however, the claimant is found to have a severe impairment the ALJ proceeds to Step Three to determine whether the impairment meets or is equal to one determined by the Commissioner to be conclusively disabling. If the impairment is specifically listed or is equal to a listed impairment, the claimant will be found disabled. 20 C.F.R. § 404.1520(d). If the impairment is not listed or is not the equivalent of a listed impairment, the ALJ moves on to Step Four to consider whether the claimant is capable of doing past relevant work. If the claimant can still perform her past work, she is not disabled. 20 C.F.R. § 404.1520(e). If the claimant cannot perform her past work, the ALJ proceeds to Step Five where he considers whether the claimant is capable of performing other work in the national economy. At Step Five, the ALJ must consider vocational factors, such as a claimant's "age, education, and past work experience." Only if a claimant is found incapable of performing other work in the national economy will she be found disabled. 20 C.F.R. § 404.1520(f); *see also Yuckert,* 482 U.S. at 140-42 (explaining the five-step process).

Court review of an ALJ's disability determination is narrow; the ALJ's findings will be affirmed if they are supported by "substantial evidence on the record as a whole." *Pearsall*, 274

F.3d at 1217. Substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." *Id.* The district court therefore should affirm the ALJ's decision as long as there is substantial evidence in the record to support the ALJ's findings, regardless of whether substantial evidence exists to support a different conclusion. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). A district court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, *Dunahoo v. Apfel*, 241 F.3d 1033, 1037 (8th Cir. 2001), or because it might have "come to a different conclusion." *Wiese v. Astrue*, 552 F.3d 728, 730 (8th Cir. 2009). Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [court] must affirm the agency's decision." *Wheeler v. Apfel*, 224 F.3d 891, 894-95 (8th Cir. 2000); *see also Owen v. Astrue*, 551 F.3d 792, 798 (8th Cir. 2008) (holding that the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

Nevertheless, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision; [courts] also take into account whatever in the record fairly detracts from that decision." *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998). In reviewing the Commissioner's decision, a district court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.
2. The claimant's vocational factors.
3. The medical evidence from treating and consulting physicians.
4. The claimant's subjective complaints relating to exertional and non-exertional activities and impairments.
5. Any corroboration by third parties of the claimant's impairments.
6. The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth the claimant's

impairment.

*Stewart v. Sec'y of Health & Human Servs.*, 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting *Cruse v. Bowen*, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

**VII.    Discussion**

On appeal Claimant argues (1) that the ALJ's RFC determination that she was capable of unskilled light work is not supported by substantial evidence on the record as a whole, (2) that the ALJ failed to give substantial weight to the opinions of treating physicians, (3) improperly relied on the opinion of Dr. Higgins, the consultative examiner and thus failed to cite to "some" medical evidence to support her RFC determination.   In addition, Claimant argues that the hypothetical question posed to the VE failed to capture the concrete consequences of her impairments.   The Commissioner asserts that Claimant's arguments fail to take into account the ALJ's credibility determinations and their effect on his RFC determination.

A. *Credibility*

In determining Claimant's RFC, the ALJ considered the credibility of Claimant's subjective complaints and determined that they were not entirely credible.   (Tr. 14-21).   The ALJ's consideration of Claimant's subjective complaints comports with the framework set forth in *Polaski v. Heckler*, 739 F.2d at 1320, 1322 (8th Cir. 1984); its progeny; the regulations at 20 C.F.R. § 416.929 (2013) and Social Security Ruling (SSR) 96-7.   In making her credibility determination, the ALJ properly considered the objective medical evidence, Claimant's failure to seek ongoing, consistent medical treatment, her activities of daily living, her demeanor at the hearing, medical opinion evidence, inconsistencies in the record, and Claimant's work history. *See Turpin v. Colvin*, 750 F.3d 989, 993 (8th Cir. 2014); *see also* 20 C.F.R. § 416.920.   Under

Eighth Circuit law, if the ALJ explicitly discredits a claimant's testimony and gives good reasons for doing so, the reviewing court should normally defer to the ALJ's credibility determination. *See Wildman v. Astrue*, 596 F.3d 959, 969 (8th Cir. 2010).

The ALJ properly determined that Claimant's allegations of disabling back pain were not supported by the objective medical evidence.   (Tr. 14-15.).   *See* 20 C.F.R. § 416.929(c)(1)-(2) (stating that the ALJ should look at the medically documented "signs" and findings to determine the intensity and persistence of the symptoms and how they actually affect the person.   In addition, the medical records show that Claimant exhibited normal gait, range of motion, strength, and musculoskeletal function.   (Tr. 278, 281, 312, 330, 373, 423, 434).   Finally, despite Claimant's complaints of pain, she appeared in no acute distress, her pain could not be reproduced and her treating physician raised the possibility of malingering.   (Tr. 265, 281, 315, 392).   (Tr. 15-16, 265, 281, 315, 334, 392, 423, 428); *see also See McCoy v. Astrue*, 648 F.3d 605, 614 (8th Cir. 2011) (noting that the absence of signs indicating discomfort or acute distress will undercut the credibility of allegations of pain) (citing *Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005)).

In addition, the ALJ correctly relied on the fact that despite her complaints, Claimant sought and received only minimal and inconsistent treatment.   (Tr. 14-15, 19, 21.); s*ee Edwards v. Barnhart*, 314 F.3d 964, 967-68 (8th Cir. 2003) (stating that "[i]t was within the province of the ALJ to discount [a claimant's] claims of disabling pain in view of her failure to seek ameliorative treatment").   For example, Claimant alleged a 2004 disability onset; but the medical records show that she stopped treatment in March 2005 and received no treatment between March 2005 and February 2010.   (Tr. 14, 19, 142, 229, 314.)   In February 2010, Claimant complained of back

19

pain, but sought no treatment for that pain from May 2010, (Tr. 15, 314, 329-31), until February 2011. (Tr. 360.) Thereafter, she sought no further treatment during 2011. (Tr. 15.) Similarly, although she alleged disabling mental impairments, Claimant never received treatment from a mental health specialist only intermittently reported symptoms of anxiety or depression to her treating physician, and had not been prescribed medication for anxiety or depression on a regular basis. (Tr. 21, 54, 181, 340); *see also Page v. Astrue*, 484 F.3d 1040, 1043-44 (8th Cir. 2007) (affirming the ALJ's determination that mental issues were not severe where the claimant sought only intermittent, limited treatment).

The ALJ properly identified other inconsistencies in the record that call Claimant's credibility into question. (Tr. 19-21.) *See Whitman v. Colvin,* 762 F.3d 70 1, 707-08 (8th Cir. 2014) (holding that subjective complaints were properly where the evidence as a whole is inconsistent with the claimant's testimony). For example, Claimant alleged visual problems, but did not seek treatment for a these symptoms. (Tr. 19, 329, 357.) In addition, she testified that she had intermittent migraine headaches that sometimes lasted for several days, (Tr. 51, 60), but the record does not indicate that she sought treatment for the headaches. (Tr. 19-21.) Moreover, Claimant asserted that she had difficulty breathing, but continued to smoke. (Tr. 19, 371, 435.)

In accordance with SSR 96-7p, the ALJ also properly considered Claimant's demeanor at the administrative hearing in assessing her credibility. (Tr. 18, 20.); *see* SSR 96-7p (stating that the ALJ is permitted to "consider his or her own recorded observations of the individual as part of the overall evaluation of the credibility of the individual's statements"). Noting that Claimant's appearance and demeanor were unpersuasive, the ALJ properly relied on this observation and found her allegations inconsistent with the record as a whole. (Tr. 12-13, 21, 23.)

Finally, the ALJ also properly considered Claimant's work history. (Tr. 18.) The record indicates that Claimant's income never exceeded $7,000 per year and that she continued to work after her first alleged onset date in 2004 through 2010 without any significant change. (Tr. 18, 19, 156, 168); s*ee Buckner v. Astrue*, 646 F.3d 549, 558 (8ᵗʰ Cir. 2011) (including a poor work history among the factors that detract from an individual's credibility).

B. *"Some Medical Evidence"*

The ALJ must determine a claimant's RFC based on all relevant, credible evidence in the record, including medical records, the observations of treating and consultative physicians and others, and the claimant's own description of his symptoms and limitations. *See McCoy*, 648 F.3d at 614 (citing *Flynn v. Astrue*, 513 F.3d 788, 792 (8th Cir. 2008)); see also 20 C.F.R. § 404.1545(a). In every instance, the RFC must be supported by "'at least some medical evidence,'" *Myers v. Colvin*, 721 F.3d 521, 527 (quoting *Wildman v. Astrue*, 596 F.3d 959, 969 (8th Cir. 2010)), which includes medical records and the observations and opinions of treating sources. *See* 20 C.F.R. §§ 416.912(b)(1), 416.913(b), 416.928(b)-(c) (2013).

Here Claimant argues that here the ALJ's RFC finding that she could perform a range of unskilled, light work was not, as required, supported by "some medical evidence." *Wildman*, 596 F.3d at 969. Specifically, Claimant asserts that the ALJ having rejected the opinions of opinion of her treating physicians, improperly relied on the opinion of Dr. Higgins, the consultative examiner, as some medical evidence to support her RFC. Claimant contends that this reliance was misplaced because Higgins was the only examining medical source to contradict the treating physicians. *See, e.g., Hatcher v. Barnhart*, 368 F.3d 1045 (8th Cir. 2004) (stating that the opinion of a consultative physician does not generally satisfy the substantial evidence requirement,

especially where the consultant is the only examining source to disagree with the treating physicians); *Cox v. Barnhart*, 345 F.3d 606, 610 (8th Cir. 2003) (same); *Jenkins v. Apfel*, 196 F.3d 922, 925 (8th Cir. 1999) (same).

For the following reasons the Court concludes that this argument lacks merit and finds that the ALJ's RFC determination is supported by some medical evidence and by substantial evidence on the record as a whole. First, in this case unlike *Cox*, the ALJ did not "completely disregard[ ]" the opinions of the treating physicians. *See Cox*, 345 F. 3d at 609-610. Although the ALJ discounted portions of Dr. Steele's opinion, she gave it some, albeit "very little weight." (Tr. 15.) In addition, here unlike in *Cox*, the "larger medical record" supports the ALJ's determination and fails to corroborate Dr. Steele's opinion. *See Brown v. Astrue*, 611 F 3d 941, 952-53 (8th Cir. 2010) (holding that *Cox* was distinguishable from the case at issue because the "larger medical record" did not "support [the treating physician's] conclusory opinion"). This is not a case where only the consultative examiner's opinion is the only thing in the record supporting a determination that Claimant's limitations do not preclude her from performing light, unskilled work. The larger medical record here supports that determination. (Tr**.** 19.) Moreover, in this case the consultative examiner was a specialist in psychology, the field pertinent to the identified mental impairment, but the treating physicians were not. *See Thomas v. Barnhart*, 130 Fed. App'x. 62, 64 (8th Cir. 2005) (unpublished per curiam) (observing that "[g]reater weight is generally given to the opinion of a specialist about medical issues in the area of specialty, than to the opinion of a non-specialist") (citing 20 CFR §§ 404.1527(d)(5); 416.927(d)(5)); *cf. Brown. Astrue*, 611 F.3d at 952 (affording the opinion of a treating specialist greater weight due to the pertinence of the specialty to the impairment at issue).

C. *The Weight Afforded the Opinions of Consultative, Examining and Treating Physicians*

Claimant next asserts that the ALJ improperly discounted the medical opinions of Dr. Steele and Dr. Coole, Claimant's treating physicians, and failed to indicate what weight he assigned to their opinions.

The opinions of treating physicians while often afforded significant weight do not automatically control. *Bernard v. Colvin*, No. 13-3357, 2014 WL 7238033, at 4 (8th Cir. Dec. 22, 2014) (citing *Turpin*, 750 F.3d at 993). Instead "[a] treating physician's opinion is given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." *Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005) (internal quotation marks and citation omitted). But where there is "conflicting evidence on the record, the ALJ's determination that the physicians' opinions were not supported by objective medical evidence does not lie outside the available zone of choice." *See Travis v. Astrue*, 477 F.3d 1037, 1042 (8th Cir. 2007) (citation omitted).

In evaluating medical opinion evidence, an ALJ properly considers the examining relationship, the treatment relationship, the supportability and consistency of the medical opinion, the specialization of the medical source, and other factors brought to the ALJ's attention that bear upon the weight to be accorded to the medical opinion evidence. *See* 20 CFR §§ 404.1527(d)(1)-(6), 416.927(d)(1)-(6). For example, a physician's statement that is "not supported by diagnoses based on objective evidence" will not support a finding of disability. *Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003). If the medical opinion is "inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight." *Id*20

C.F.R. § 404.1527(d)(2). In addition, "[a]n ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (internal quotation marks and citation omitted). Finally, the ALJ may give less weight to a conclusory or inconsistent opinion espoused by a treating physician. *See Samons v. Astrue*, 497 F.3d 813, 818 (8th Cir. 2007; *Ward v. Heckler*, 786 F.2d 844, 846 (8th Cir. 1986) (per curiam) (noting that "[e]ven statements made by a claimant's treating physician regarding the existence of a disability have been held to be properly discounted in favor of the contrary medical opinion of a consulting physician where the treating physician's statements were conclusory in nature").

As a preliminary matter, there is no question that the ALJ explicitly stated that she gave "little weight" to Dr. Steele's opinion. (Tr. 15.)

Dr. Steele provided an opinion that Claimant could lift ten pounds occasionally and less than ten pounds frequently, sit for less than two hours in an eight hour workday, and stand or walk for less than two hours in an eight hour workday. (Tr. 335, 430.) The opinion was provided on a check box form, failed to cite to objective evidence and included little or no explanation for the conclusions drawn. (Tr. 334-36, 428-43). These insufficiencies alone provide a valid basis for the ALJ's decision to partially discount Dr. Steele's opinion. *See Anderson v. Astrue*, 696 F.3d 790, 794 (8th Cir. 2012) (quoting *Wildman*, 596 F.3d at 964) (stating that the Eighth Circuit "ha[s] recognized that a conclusory checkbox form has little evidentiary value when it 'cites no medical evidence, and provides little to no elaboration.'"). In addition, Dr. Steele's opinion is neither supported by nor consistent with his treatment notes, which reflect an absence of significant

objective abnormalities. (Tr. 259-61, 310-13, 357, 370-71) This inconsistency supports the

ALJ's determination that Dr. Steele's opinion was "extremely out of proportion" to the objective

evidence. (Tr. 15.) *See Sultan v. Barnhart*, 368 F.3d 857, 863 (8th Cir. 2004) (holding that an

ALJ is warranted in discrediting an opinion that is inconsistent with, or contradicted by, other

evidence in the record).

Moreover, in support of his opinion Dr. Steele cites almost exclusively to Claimant's

subjective complaints of pain which the ALJ properly determined lack credibility. (Tr. 14-21,

334, 428.) Non-credible subjective complaints do not provide the objective evidence necessary to

justify affording controlling or great weight to a doctor's opinion. *See McCoy*, 648 F.3d at 617

(finding that a physician's opinion was "rendered less credible," where it appeared to be based, at

least in part, on the claimant's self-reported symptoms which the ALJ had found less than

credible). In addition, Dr. Steele raised the possibility that Claimant was a malingerer but then

heavily relied upon her subjective reports of pain and limitation. This contradiction also

significantly detracts from the reliability of his opinion. *See Bernard*, 2014 WL 7238033, at *4;

*Sultan*, 368 F.3d at 857. Finally, Dr. Steele's opinion invaded the province of the Commissioner

by offering an opinion on the ultimate issue of whether Claimant was disabled. *See, e.g.*, *Brown*,

611 F.3d at 952 (stating that treating physicians' opinions should not be credited when they simply

state that a claimant cannot be gainfully employed); *Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir.

2005) (stating that "[a] medical source opinion that an applicant is 'disabled' or 'unable to work' ...

involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion'

to which the Commissioner gives controlling weight") (citing *Stormo v. Barnhart*, 377 F.3d 801,

806 (8th Cir. 2010)). For these reasons the ALJ's decision to give Dr. Steele's opinion little

weight is supported by substantial evidence on the record as a whole.

Claimant's contention that the ALJ should have afforded more weight to the opinion of Dr. Coole, another treating physician, also lacks merit.   (Tr. 21, 441.)   After examining Claimant only once, Dr. Coole opined that Claimant's impairments made it impossible for her to serve as a juror, but did not specify the nature of the impairments or why they precluded jury service.   (Tr. 441.)   The ALJ did not err in giving little weight to Dr. Coole's opinion because Dr. Coole's statements were conclusory and premised upon a one-time medical evaluation.  *See Brown*, 611 F.3d at 952; *Ward*, 786 F.2d at 846 (per curiam) (noting that "[e]ven statements made by a claimant's treating physician regarding the existence of a disability have been held to be properly discounted in favor of the contrary medical opinion of a consulting physician where the treating physician's statements were conclusory in nature.").

D.   *The Full Range of Unskilled Work*

Claimant also argues that the ALJ erred in finding that Claimant could perform the full range of unskilled work.   Specifically, she contends that Dr. Toll's opinion that she could follow no more than one or two-step instructions, (Tr. 369), does not support a determination that she could perform unskilled work because unskilled work includes the performance of tasks requiring more than two step instructions.   The Court does not agree.

Claimant correctly asserts that "unskilled work" is not restricted to tasks involving only one or two - step instructions.   *See* SSR 85-15, 96-9p (specifying only that "unskilled work" relates to tasks involving "simple" instructions); Dictionary of Occupational Titles (DOT), reasoning code 1 (same).   But her argument ignores the fact that in formulating her RFC the ALJ attributed weight to and relied upon the opinion of Dr. Higgins, an opinion which did not restrict

Claimant to the performance of one or two-step instructions.   To the extent that Dr. Toll's opinion corroborated Dr. Higgins, the ALJ found it persuasive, but the ALJ did not adopt the one or two-step restriction stated by Dr. Toll.   (Tr. ???)

### D. *Hypothetical Question posed to the VE*

At Step 4 the ALJ determined that Claimant had no past relevant work.   Then at Step 5, having determined that Claimant would be able to make an adjustment to other jobs in the national economy, the ALJ relied on the VE's response to her hypothetical question and concluded that Claimant would be able to perform work as a cashier.   The ALJ further found on the basis of the VE testimony that "cashier" is a job available in significant numbers in the national economy. Therefore, the ALJ properly concluded that Claimant was capable of other work and, thus, not disabled.   (Tr. 18, 21-23.)

Claimant asserts, however, that the hypothetical question posed to the VE did not capture the concrete consequences of her impairment.   (Tr. 64-65.)   In this case, the ALJ's hypothetical question assumed an individual with Claimant's vocational factors and possessing those limitations that the ALJ found credible.10      The VE opined that such an individual could perform work as a cashier.   (Tr. 18, 64-65.)   In addition, the VE testified that an individual with Claimant's credible limitations could perform work existing in significant number in the national economy.   (Tr. 64-65).

---

10      The VE was asked to assume a person of the Claimant's age, education and past work experience, capable of performing only unskilled work at the light exertional level. The hypothetical presumed an individual further limited in that she may only occasionally climb ramps and stairs, never climb ladders or scaffolds, frequently balance, and occasionally stoop, kneel, crouch and crawl.   (Tr. 64-65.)

Testimony from a vocational expert based on a properly-phrased hypothetical constitutes substantial evidence. *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996). The hypothetical question must set forth with reasonable precision a claimant's impairments, but it need not include those impairments and limitations rejected by the ALJ because they lack credibility. *See McCoy*, 648 F.3d at 617. The ALJ was not required to include in her hypothetical all limitations alleged by Claimant and she properly included only the limitations she found credible. *See Gragg v. Astrue*, 615 F.3d 932, 940 (8th Cir. 2010).

**VIII.  Conclusion**

The ALJ's determination is supported by substantial evidence on the record and she properly considered the evidence with respect to credibility, the validity and weight to be afforded various medical opinions, the effect of Claimant's mental impairment on her RFC. The ALJ also propounded a hypothetical that accurately reflected the evidence of record and Claimant's credible limitations. Inasmuch as the ALJ's RFC finding was within the "zone of choice" and supported by substantial evidence it will be upheld. *See Travis v. Astrue*, 477 F.3d 1037, 1042 (8th Cir. 2007).

Accordingly,


**IT IS HEREBY ORDERED t**hat the final decision of the Commissioner denying SSI payments is **AFFIRMED**. (Doc. No. 15).

*/s/ Terry I. Adelman*
TERRY I. ADELMAN
UNITED STATES MAGISTRATE JUDGE

Dated this   2nd   day of February, 2015.